United States District Court
Southern District of Texas
**ENTERED**
September 08, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL E. DAVIS, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:15-cv-159 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| et al., | § | |
| Defendants. | § | |

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

The Court is in receipt of the Federal Defendants' Motion to Dismiss and Memorandum in Support (hereinafter, the "Federal Defendants' Motion"), filed by the United States of America; Tom Vilsack, Secretary of the U.S. Department of Agriculture; Kevin Shea, Administrator of the U.S. Department of Agriculture Animal and Plant Health and Inspection Service; and Gina McCarthy, Administrator of the U.S. Environmental Protection Agency (hereinafter, the "Federal Defendants," or "Defendants"). Dkt. No. 47. The Federal Defendants' Motion asserts that this Court lacks subject matter jurisdiction over the Complaint filed by Daniel E. Davis and Cascabel Cattle Company, L.L.C., (hereinafter, "Plaintiffs' Complaint"). *Id.* at 9-26. In the alternative, the Federal Defendants argue that Plaintiffs' Complaint should be dismissed because Plaintiffs have failed to state a claim. *Id.* For the reasons provided below, it is recommended that the Court dismiss Plaintiffs' Complaint without prejudice pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(b)(1).

# I.  Jurisdiction

The Federal Defendants argue that this Court lacks subject matter jurisdiction; therefore, Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 47 at 9-21, 26.  For the reasons provided below, dismissal pursuant to Rule 12(b)(1) is appropriate.

# II.  Relevant Procedural History and Background

Plaintiffs Daniel E. Davis ("Davis") and Cascabel Cattle Company ("Cascabel") initiated this lawsuit by filing a ninety-page Complaint on September 4, 2015.  Dkt. No. 1.  Davis is a resident of Cameron County, Texas, and Cascabel is "a Texas limited liability corporation" doing business in Cameron County, with Davis "acting as its Managing Member and President."  *Id*. at 13.  Plaintiffs' Complaint names seven individuals or entities as defendants in this lawsuit.[1]  Four of these defendants are the above-referenced Federal Defendants: (1) USA; (2) Vilsack, Secretary of the U.S. Department of Agriculture ("USDA"); (3) Shea, Administrator of the USDA's Animal and Plant Health and Inspection Service ("APHIS"); and, (4) McCarthy, Administrator of the U.S. Environmental Protection Agency ("EPA").  *Id*. at 9; Dkt. No. 24 at 4, note 1 (listing Defendants'

---

[1]  Plaintiffs' Complaint lists Bayer Healthcare, LLC, (hereinafter referred to as "Bayer") as a defendant.  Dkt. No. 1 at 1.  However, Bayer has been dismissed from this lawsuit.  *See* Dkt. No. 74 ("Plaintiffs' Notice of Voluntary Dismissal of Bayer Healthcare, LLC"); Dkt. No. 75 (Order dismissing Bayer without prejudice pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure).

correct titles).  Plaintiffs have sued Vilsack, Shea, and McCarthy in their official capacities only.  Dkt. No. 1 at 9.

Plaintiffs have also sued Ernie Morales, in his official capacity as Chairman of the Texas Animal Health Commission ("TAHC"), and Dee Ellis, of the TAHC, in his individual capacity (hereinafter referred to as the "State Defendants").  Dkt. No. 1 at 1; Dkt. No. 4 at 1 (identifying Ellis and Morales as "State Defendants").[2]

Plaintiffs allege that all of the Defendants have harmed them by injuring and killing their cattle, and by causing the sale price of their cattle to drop.  Plaintiffs state that Defendants did this pursuant to the administration of the Tick Eradication Program (hereinafter, "the Program"), a cooperative federal-state program designed to eliminate fever ticks and prevent the spread of cattle fever, a potentially fatal bovine disease.  Pursuant to the Program, the alleged misapplication of applicable rules, and the alleged failure to follow applicable rules, Plaintiffs claim that Defendants quarantined Plaintiffs' properties and insisted that Plaintiffs' cattle be treated with a fever tick insecticide, Co-Ral® 42% Coumaphos Flowable.  Plaintiffs state that Defendants illegally treated their cattle through methods that caused their cattle to ingest and inhale the insecticide, resulting in the injury and death of some of their cattle.  Dkt. No. 1 at 20-24, 30-39.

Plaintiffs contend that Defendants' use of Co-Ral® 42% Coumaphos Flowable Insecticide is illegal because: (1) the insecticide has never been approved for the purpose of treating cattle for fever ticks; (2) Defendants are using the insecticide in

---

[2] Prior to his retirement on December 31, 2015, Dee Ellis was the State Veterinarian and Executive Director of the TAHC.  *See* Dkt. No. 49-3 at 13.

a way that is prohibited by its labeling; and, (3) Defendants' use of the insecticide fails to comply with the requirements of the Administrative Procedures Act ("APA"). Plaintiffs argue that Defendants could hand spray Plaintiffs' cattle, which would prevent their cattle from ingesting and inhaling the insecticide.  They state that Defendants have refused to use this safer method, and insisted that the insecticide be applied through full-immersion dipping, or through the use of a spray box that encloses the nose and mouth of each sprayed animal.  Plaintiffs assert that Defendants continue to harm them, as they will not allow Plaintiffs' cattle to be sold or moved through interstate commerce, without first being treated with the insecticide through methods causing inhalation or ingestion.  Dkt. No. 1 at 20-24, 30-39.  Plaintiffs claim that the acts and omissions of Defendants have violated their rights under "the 5th, 4th, and 14th Amendments of the U.S. Constitution; 5 U.S.C. § 552 *et seq*., 5 U.S.C. § 553(e); 5 U.S.C. § 553(b); 5 U.S.C. § 553(c); 5 U.S.C. § 554(c); 5 U.S.C. § 556(d); 5 U.S.C. § 552(a); 5 U.S.C. § 557, and 5 U.S.C. § 701 *et seq*."  Dkt. No. 55 at 10 (errors in original).

Plaintiffs additionally claim that Defendants have violated the National Environmental Policy Act of 1969 ("NEPA"), by failing to prepare an environmental impact statement to assess the environmental effects of the Program.  Plaintiffs indicate that Defendants have also violated NEPA by chasing Plaintiffs' cattle on horseback, and disrupting the eating routines and habitats of numerous protected species on Plaintiffs' land.  Further, Plaintiffs assert that Defendants have contaminated their land by illegally dumping the insecticide on their properties

after its use.  Plaintiffs state that this dumping has harmed the food supply, water supply, and habitats of various protected species including the Ocelot, the Aplomado Falcon, the Jaguarundi, the Texas Horned Lizard, the Texas Tortoise, and the Blue Indigo Snake.  Plaintiffs assert that Defendants have also been exterminating Nilgai antelopes on their properties in an effort to prevent the spread of fever ticks, and that Defendants' extermination efforts have threatened Plaintiffs' safety.  Dkt. No. 1 at 24, 35-36, 39-41, 77.[3]

The Federal and State Defendants take issue with Plaintiffs' allegations.  *See generally* Dkt. Nos. 47 and 49.  The Federal and State Defendants also take issue with Plaintiffs' assertions regarding their own standing and this Court's jurisdiction to hear Plaintiffs' claims.  *Id*.  On February 5, 2016, the Federal Defendants filed their instant Motion, seeking dismissal of Plaintiffs' Complaint.  Dkt. No. 47.  On the same day, the State Defendants filed a Motion to Dismiss pursuant to the "Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)" (hereinafter, the "State Defendants' Motion").  Dkt. No. 49.[4]

The Federal and State Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' Complaint because Plaintiffs lack standing to bring their claims.  *See* Dkt. Nos. 47, 49, 65, 66.  These Defendants argue that Plaintiffs lack standing to bring their claims because they have failed to allege that they have

---

[3]  The Court's summary of Plaintiffs' allegations here is not exhaustive.  Plaintiffs ninety-page Complaint contains a plethora of claims and allegations which the Court will address in more detail below.

[4]  The Court will address the State Defendants' Motion in a separate Report and Recommendation.  Further, Plaintiffs have filed a Motion for Entry of Default Judgment (Dkt. No. 44), which the Court will also address in a separate Report and Recommendation.

suffered, or will suffer, an injury that is: (1) actual or imminent; (2) fairly traceable to any Defendants' acts or omissions; and, (3) redressable by a favorable ruling from this Court. *Id*. In the alternative, the Federal and State Defendants argue that Plaintiffs have failed to state a claim. *Id*.

Plaintiffs have filed responses and sur-replies to the Federal Defendants' Motion and the State Defendants' Motion. Dkt. Nos. 55, 60, 71, 72. With respect to their standing, Plaintiffs assert that all of the Defendants have injured them through the following acts and omissions:

1. Requiring Plaintiffs' cattle to be dipped through 100% immersion, before sale, even though Plaintiffs' cattle tested negative for ticks;

2. Preventing the sale of Plaintiffs' cattle when Plaintiffs' cattle tested negative for ticks;

3. Preventing the sale of Plaintiffs' cattle because 100% of Plaintiffs' cattle had not been tested;

4. Killing and injuring some of Plaintiffs' cattle by requiring 100% immersion dipping;

5. Killing and injuring some of Plaintiffs' cattle by requiring spray-box application of Co-Ral® 42% Coumaphos Flowable Insecticide;

6. "[R]efusing to provide documentation or results of inspection, thus elimination of documented proof of Defendants' improper activities related to cattle deaths, cattle injuries, and general damages, and preventing Plaintiffs from seeking appropriate reimbursement through the claim process;"

7. Threatening criminal charges if Plaintiffs did not comply with the Program requirements;

8. Frequently changing their "verbal commitments" and description of "so-called applicable laws;"

9.     Discriminating against Plaintiffs by requiring compliance with procedures not required of other cattle owners;

10.     Quarantining Plaintiffs' properties without presenting evidence that the properties contained fever ticks;

11.     Enforcing "memorandums, guidances, and preferences as if they were regulations;"

12.     Failing to abide by the "safety rules associated with Co-Ral® 42% Coumaphos Flowable Insecticide labels;"

13.     Killing and injuring Plaintiffs' cattle by causing them to ingest and inhale Co-Ral® 42% Coumaphos Flowable Insecticide, "thus causing monetary damages to Plaintiffs;"

14.     Slandering Plaintiff Davis and damaging his reputation by saying that he was "a trouble maker;"

15.     Denying Plaintiff Davis his "constitutional" and "First Amendment" rights by ordering lifelong friends who worked for Defendants not to speak to him;

16.     Causing the price of Plaintiffs' cattle to decrease due to the buyers' perception that the cattle were injured or likely to die as a result of their ingestion or inhalation of Co-Ral® 42% Coumaphos Flowable Insecticide;

17.     Injuring Plaintiffs by forcing them to hire counsel and spend their time, money and energy to protect their legal rights;

18.     Denying Plaintiffs' "requests for open records;"

19.     Injuring Plaintiffs by failing to give them "copies of asserted applicable laws;"

20.     Quarantining Plaintiffs' properties while failing to quarantine similarly situated properties "due to the lack of properly enacted rules," thus "injuring Plaintiffs under the Fifth and Fourteenth Amendments of the U.S. Constitution;"

21.     Violating NEPA by chasing Plaintiffs' cattle on horseback and disrupting the eating routines and habitats of numerous protected species on Plaintiffs' land;

22.    Denying Plaintiffs' right to have their cattle hand sprayed.

Dkt. No. 1 at 20-24 (errors in original).

Plaintiffs additionally reject the Federal and State Defendants' argument that their Complaint is subject to dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. They argue that they have stated claims against the Federal and State Defendants because they have alleged plausible facts in support of each claim. *See generally* Dkt. Nos. 55, 60, 71, 72.

## III.  Legal Standards

**A.  Subject Matter Jurisdiction.**  "Federal courts are courts of limited jurisdiction[.]" *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998) (citing *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)). The party asserting jurisdiction "constantly bears the burden of proof" to show that jurisdiction exists. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

> When a party files a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion. If, however, the defendant supports the motion with affidavits, testimony, or other evidentiary materials, then the attack is factual and the burden shifts to the plaintiff to prove subject matter jurisdiction by a preponderance of the evidence.

*MacKenzie v. Castro*, No. 3:15-CV-0752-D, 2016 WL 3906084, at *2 (N.D. Tex. July 19, 2016) (citations and quotations omitted).  Courts may resolve disputes over alleged jurisdictional facts by looking to: (1) the complaint; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, plus the court's resolution of disputed facts. *Ramming*, 281 F.3d 158, 161.

When federal question jurisdiction is alleged, courts generally apply the well-pleaded complaint rule to determine whether a case is one "arising under" federal law.  *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 328 (5th Cir. 2008) (citations omitted).  Pursuant to the well-pleaded complaint rule, courts determine if a case is one arising under the Constitution or the laws of the United States by reviewing "plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose."  *Id*. (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 10 (1983)).

> Under *Bell v. Hood*, 327 U.S. 678, 681–82, 66 S.Ct. 773, 90 L.Ed. 939 (1946), "[i]n federal question cases . . . where the complaint is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions[,] must entertain the suit.  The two exceptions are where the federal question clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Southpark Square Ltd. v. City of Jackson*, 565 F.2d 338, 341 (5th Cir. 1977) (internal punctuation, quotation marks, and citations omitted) (quoting *Bell*, 327 U.S. at 681–82, 66 S.Ct. 773).  The Fifth Circuit has interpreted this rule as applying "only where the plaintiff's claim has no plausible foundation or is clearly foreclosed by a prior Supreme Court decision." *Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. 1981) (internal quotation marks omitted); *see also Young*

> *v. Hosemann*, 598 F.3d 184, 188 (5th Cir. 2010). If a claim meets this two-part test it is said to be "non-frivolous" and jurisdiction attaches. The test "is a rigorous one and if there is any foundation of plausibility to the claim federal jurisdiction exists." *Southpark Square Ltd.*, 565 F.2d at 342–43.

*Michael v. Boutwell*, 138 F. Supp. 3d 761, 775–76 (N.D. Miss. 2015) (footnote omitted).  In general, a "failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."  *Bell v. Hood*, 327 U.S. 678, 682.  The Fifth Circuit has recently reiterated that "dismissal for want of jurisdiction is disfavored as a matter of policy" when a federal claim is apparent on the face of a complaint.  *Young v. Hosemann*, 598 F.3d 184, 188 (5th Cir. 2010).

> Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits.  This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) (for failure to state a claim upon which relief can be granted) or Rule 56 (summary judgment)—both of which place greater restrictions on the district court's discretion.

*Id*. (quoting *Williamson v. Tucker*, 645 F.2d 404, 415-16 (5th Cir. 1981) (en banc)).

**B.  Standing**.  If a plaintiff lacks Article III standing to bring his claims in federal court, the court will lack subject matter jurisdiction over those claims.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146, 185 L. Ed. 2d 264 (2013).  To establish  standing, a plaintiff must satisfy three criteria.

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged

> action of the defendant, and not the result of the independent action of
> some third party not before the court.   Third, it must be likely, as
> opposed to merely speculative, that the injury will be redressed by a
> favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and

quotations omitted).   If seeking injunctive relief, the plaintiff bears the additional

burden of establishing a "real or immediate threat that the plaintiff will be

wronged" in the future.   *City of Los Angeles v. Lyons*, 461 U .S. 95, 111 (1983).

    **C.   Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6)**.   Rule 8(a)(2)

of the Federal Rules of Civil Procedure sets out the fundamental pleading standard

for civil litigation and requires "a short plain statement of the claim showing that

the pleader is entitled to relief."   FED. R. CIV. P. 8(a)(2).   Pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure, a plaintiff must state a claim upon which

relief can be granted or the complaint may be dismissed with prejudice as a matter

of law.   FED. R. CIV. P. 12(b)(6).   When considering a motion to dismiss for failure to

state a claim, well-pleaded facts must be accepted as true and viewed in the light

most favorable to the plaintiff.   *In re Katrina Canal Breaches Litig.*, 495 F.3d 191,

205 (5th Cir. 2007) (citing *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*,

369 F.3d 464, 467 (5th Cir. 2004) and *Jones v. Greninger*, 188 F.3d 322, 324 (5th

Cir. 1999)).

    In *Katrina Canal Breaches*, the Fifth Circuit acknowledged the Supreme

Court's abrogation of the "no set of facts" standard for determining the adequacy of

a pleading:

> We have often stated that a claim should not be dismissed under Rule 12(b)(6) unless the plaintiff would not be entitled to relief under any set of facts or any possible theory he may prove consistent with the allegations in the complaint. *See, e.g., Martin K. Eby Constr.*, 369 F.3d at 467 (quoting *Jones*, 188 F.3d at 324). This standard derived from *Conley v. Gibson*, which stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957). But recently in *Bell Atlantic*, the Supreme Court made clear that the Conley rule is not "the minimum standard of adequate pleading to govern a complaint's survival." 127 S.Ct. at 1968-69.

495 F.3d at 205 n.10. To withstand a Rule 12(b)(6) motion, then, "the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id*. at 205 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570-72, 127 S. Ct. 1955, 1974 (2007)). This means that a complaint, taken as a whole, "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory[.]" *Twombly*, 550 U.S. 544, 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (internal quotation marks omitted; emphasis and omission in original)).

The complaint must also meet the twin requirements of fact-based pleading and plausibility. More specifically, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944 (2007)). "Factual allegations must be enough to raise a right to relief above the

speculative level . . . on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." *Id.*

Although the Supreme Court in *Twombly* stressed that it did not impose a probability standard at the pleading stage, an allegation of a mere possibility of relief does not satisfy the threshold requirement of Rule 8(a)(2) that the "plain statement" of a claim include factual "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief. *Twombly*, 550 U.S. 544, at 557. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 684, 129 S.Ct. 1937, 1953 (2009) (rejecting the argument that the *Twombly* plausibility pleading standard applied only in antitrust cases and expressly holding the standard applies "all civil actions."). A court need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions[.]" *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).

## IV. Discussion

At the threshold, the Court notes that Plaintiffs' Complaint is filled with convoluted, repetitive, and conclusory allegations. Plaintiffs' lack of clarity is exacerbated by their failure to provide specific facts in support of each claim. Instead, when stating their claims, Plaintiffs merely repeat, re-allege, and incorporate "every allegation" contained in their ninety-page Complaint without regard to whether those allegations pertain to the claim alleged. Dkt. No. 1 at 69,

70, 71, 72, 74, 75, 76, 77.  Plaintiffs have also muddied the waters of this case by attempting to alter some of the claims included in their Complaint through stipulations contained in later pleadings.  In other words, Plaintiffs have attempted to stipulate away some of their allegations, rather than move to amend their Complaint to clearly state their claims for the benefit of the Defendants and the Court.  *Compare* Dkt. No. 1 at 84-85 (requesting an order directing Defendants to "cease all activities" under the Program, and directing Federal Defendants Vilsack and Shea to "promulgate new standards which comply in all respects with the APA with respect to implementation of the Tick Eradication Program in Texas, including its application with Plaintiffs, and other cattle owners"), *with* Dkt. No. 55 at 11 ("Plaintiffs <u>stipulate</u> that their Verified Complaint ONLY applies to their cattle, whether on their property, or elsewhere.  Plaintiffs <u>stipulate</u> that do not wish to stop the Tick Program.") (errors and emphasis in original).

Plaintiffs' lack of clarity makes identifying their claims against the Federal Defendants difficult.  Determining whether a claim should be dismissed under Rule 12(b)(1) or 12(b)(6) is problematic if the Court cannot identify the claim in the first instance.  Thus, before addressing Plaintiffs' claims and their standing to assert those claims, the Court will review all of Plaintiffs' claims in order to identify the claims which actually apply to the Federal Defendants, and actually qualify as causes of action within the subject matter jurisdiction of this Court.

**A.     Identifying Plaintiffs' Claims Against the Federal Defendants.** Plaintiffs' Complaint lists Counts One through Count Eleven under

their "Causes of Action" heading.  Dkt. No. 1 at 2-3.  In the body of their Complaint,

Plaintiffs list their claims as follows:

| | |
|---|---|
| COUNT ONE: | Violation of the Administrative Procedures Act, 5 U.S.C § 553; |
| COUNT TWO: | Violation of the APA, 5 U.S.C. § 706; |
| COUNT THREE: | Other Violations of the APA; |
| COUNT FOUR: | Declaratory Judgment; |
| COUNT FIVE: | Mandamus Relief; |
| COUNT SIX: | Violation of Constitutional Due Process Rights; |
| COUNT SEVEN: | Violation of Constitutional Rights: – Illegal Searches and Seizures; |
| COUNT EIGHT: | Violation of Constitutional Rights Insuring Equal Protection Under Law; |
| COUNT NINE: | Violation of National Environmental Policy Act for Failure to Prepare an Environmental Impact Statement (EIS); |
| COUNT TEN: | Injunctive Relief; |
| COUNT ELEVEN: | 42 U.S.C. §§ 1983, 1985 Relief. |

*Id*. at 69-79 (formatting altered).

**(1) Counts Four and Ten**.  Counts Four and Ten purport to be claims for

declaratory and injunctive relief.  Dkt. No. 1 at 72-73, 77-78 ("COUNT FOUR –

<u>Declaratory Judgment</u>[.]" . . . .  "COUNT TEN – <u>Injunctive Relief</u>").  Injunctions and

declarations are forms of relief, not causes of action.  *See Harris Cty. Texas v.*

*MERSCORP Inc.*, 791 F.3d 545, 552–53 (5th Cir. 2015) (collecting cases and noting

that the Declaratory Judgment Act "does not create a federal cause of action.");

*Total Gas & Power N. Am., Inc. v. Fed. Energy Regulatory Comm'n*, No. CV 4:16-1250, 2016 WL 3855865, at *2–3 (S.D. Tex. July 15, 2016) ("The Declaratory Judgment Act does not enlarge the district courts' original jurisdiction; the Act is 'procedural only.'  There must be an independent basis of jurisdiction for the Court to render declaratory judgment.") (citations omitted); *Cavada v. Bank of Am.*, *N.A.*, No. A-14-CV-00938-LY-ML, 2015 WL 3480380, at *7 (W.D. Tex. June 2, 2015) ("a request for injunctive relief is not considered an independent 'cause of action,' but rather a remedy sought to redress the wrongs alleged in the underlying substantive claims.  *La. Crisis Assistance Ctr. v. Marzano–Lesnevich*, 878 F.Supp. 2d 662, 669 (E.D. La. 2012) (collecting numerous federal cases so holding).").  Counts Four and Ten do not qualify as legal claims against the Federal Defendants because they are not causes of action.  Further, as this Court finds that Plaintiffs have failed to demonstrate standing and state a claim for relief against the Federal Defendants (*see infra* Section V of this Report), it follows that Plaintiffs are not entitled to obtain the declaratory and injunctive relief they seek.

(2)  **Count Five.**  Count Five purports to be a claim for "Mandamus Relief." Dkt. No. 1 at 73-74.  Section 1361 of Title 28 provides that "any action in the nature of mandamus" may be used "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C.A. § 1361 (West).  The Federal Defendants argue that, just as Counts Four and Ten are not causes of action, Count Five is not a cause of action because it is only a form of relief.  Dkt. No. 47 at 14, note 8.  Plaintiffs themselves appear to acknowledge this

in their Complaint by referring to mandamus relief as a remedy, and by stating that mandamus "can be used" as a mechanism "to compel administrative agencies to act[.]"  Dkt. No. 1 at 74 (citing 28 U.S.C.A. § 1361).

In general, mandamus is not an independent cause of action, but rather a remedy, procedural mechanism, or form of appeal.  *In re Stone*, 118 F.3d 1032, 1033-34 (5th Cir. 1997) (collecting cases); *Trant v. Oklahoma*, 754 F.3d 1158, 1174 n.9 (10th Cir. 2014) (noting that "mandamus" is a form of relief, not a "separate cause of action"); *Elias v. Boswell*, No. 313-CV-22-WKW, 2013 WL 5883408, at *6-7 (M.D. Ala. Oct. 30, 2013) (noting that requests for declaratory, injunctive, and mandamus relief are not causes of action).  Count Five does not qualify as a legal claim against the Federal Defendants because it is not a cause of action.  Further, as this Court finds that Plaintiffs have failed to demonstrate standing and state a claim for relief against the Federal Defendants (*see infra* Section V of this Report), it follows that Plaintiffs are not entitled to obtain the mandamus relief they seek.

**(3)  Count Eleven**.  Count Eleven seeks relief under § 1983 and § 1985 of Title 42 against State Defendant Ellis, "and one or more co-conspirators."  Dkt. No. 1 at 78-79.  If Plaintiffs meant to allege that the Federal Defendants are liable § 1983 and § 1985 as co-conspirators and state actors, their Complaint does not make that intention clear.[5]

Regardless of Plaintiffs' intentions, § 1983 does not apply to the Federal Defendants.  *See* 42 U.S.C. § 1983 (prohibiting civil rights deprivations by persons

---

[5]  Due to Plaintiffs' failure to plead their claims clearly, however, the Federal Defendants have responded to Count Eleven in an apparent abundance of caution.  *See* Dkt. No. 47 at 26.

acting under color of "any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia"). *See also Prentice v. United States*, 980 F. Supp. 2d 748, 752–53 (N.D. Tex. 2013) ("Section 1983 applies to persons acting under color of state law and does not permit claims against federal agencies or federal officials acting under color of federal law. *See Resident Council of Allen Parkway Village v. U.S. Dep't of Hous. & Urban Dev.*, 980 F.2d 1043, 1053 (5th Cir. 1993)."), *abrogated on other grounds by Passmore v. Baylor Health Care Sys.*, 823 F.3d 292 (5th Cir. 2016).

Plaintiffs' § 1985 allegations are similarly problematic.  Section 1985 "was passed as part of the Ku Klux Klan Act of 1871 to protect individuals from race-based conspiracies aimed at depriving them of their civil rights[.]"  *Prentice v. United States*, 980 F. Supp. 2d 748, 752–53 (citing *Eitel v. Holland*, 787 F.2d 995, 1000 (5th Cir. 1986)).  Section § 1985 has three subsections.  *See* 42 U.S.C. § 1985(1)-(3).  The first subsection concerns acts which obstruct officers of the United States, such as by preventing them from holding office, or discharging their duties. 42 U.S.C. § 1985(1) ("Preventing officer from performing duties.").  The second subsection concerns acts which obstruct justice in court proceedings.  42 U.S.C. § 1985(2) ("Obstructing justice; intimidating party, witness, or juror").  The third subsection concerns conspiratorial acts which deprive individuals of their rights or privileges.  42 U.S.C. § 1985(3) ("Depriving persons of rights or privileges").

The third subsection, § 1985(3), provides a cause of action to persons who are harmed by conspiracies to deprive them of "equal protection of the laws, or of equal

privileges and immunities under the laws." *Pinedo v. City of Dallas, Tex.*, No. 3:14-CV-0958-D, 2015 WL 5021393, at *10 (N.D. Tex. Aug. 25, 2015), *appeal dismissed* (Jan. 14, 2016).  In its entirety, 1985(3) provides as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C.A. § 1985(3) (West).  To prevail under § 1985(3), a plaintiff must show that:

> (1) the defendants conspired (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and (3) one or more of the conspirators committed some act in furtherance of the conspiracy; whereby (4) another person is injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States; and (5) the action of the conspirators is motivated by a racial animus.

*Pinedo*, 2015 WL 5021393, at *10 (citing "*Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270 n. 12 (5th Cir. 2001) (quoting *Wong v. Stripling*, 881 F.2d 200, 202–03 (5th Cir. 1989))").

With respect to their § 1985 claims, Plaintiffs do not specify if they are seeking relief under § 1985(1), § 1985(2), or §1985(3).   Dkt. No. 1 at 78-79. Nevertheless, because none of the allegations in Plaintiffs' Complaint invoke the first two subsections of § 1985, and because Count Eleven complains of a conspiracy to deprive Plaintiffs of their constitutional and statutory rights (*see id.* at 68, 78-79), the Court will presume that Plaintiffs wish to proceed under § 1985(3).

Section 1985 does not authorize lawsuits challenging actions taken under color of federal law, nor does it waive the United States' sovereign immunity.   *Dye v. United States*, 516 F. Supp. 2d 61, 71 (D.D.C. 2007).   Sections 1985 and 1983 "are addressed to state action, not federal action, and to persons, not governments."   *Id. See also Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999) ("This Court has long recognized that suits against the United States brought under the civil rights statutes are barred by sovereign immunity."); *Beale v. Blount*, 461 F.2d 1133, 1137 (5th Cir. 1972) (declaring that claims brought under 42 U.S.C. §§ 1981–1988 were "barred by the doctrine of sovereign immunity."); *Woods v. U.S. Dep't of Educ.*, No. 2:09-CV-00634-CW, 2010 WL 3069595, at *1 (D. Utah June 29, 2010), *report and recommendation adopted*, No. 2:09CV634-CW, 2010 WL 3063200 (D. Utah Aug. 4, 2010) ("Congress has not waived immunity to suits brought under 42 U.S.C. § 1983 or 42 U.S.C. § 1985.

Because both 'statutes are addressed to state action, not federal action, and to persons, not governments,' claims for damages against the United States or its agencies under these statutes should be dismissed for lack of subject matter jurisdiction.") (citations omitted).   To the extent that Plaintiffs seek to hold the Federal Defendants liable under 42 U.S.C. § 1983 and § 1985, then, Plaintiffs may not proceed.   Count Eleven fails to state a claim against the Federal Defendants within the subject matter jurisdiction of this Court.

**(4)  Plaintiffs' Notice of Intent to File Citizen Suit**.  Plaintiffs have also attached a Notice of Intent to File Citizen Suit (hereinafter, "Notice of Intent"), to their Complaint.  Dkt. No. 1-1.  This Notice of Intent, dated August 19, 2015, declares Plaintiffs' intent to sue APHIS and TAHC for violations of various federal laws including: (1) the Clean Water Act ("CWA"); (2) the Resource Conservation and Recovery Act ("RCRA"); (3) the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"); (4) the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"); and, (5) the Endangered Species Act ("ESA").  *Id.* at 2-4.  Plaintiffs' Complaint states that the Notice of Intent is "incorporated herein for all purposes."  Dkt. No. 1 at 12.  Plaintiffs also state that they "reserve the right to amend their pleadings to include enforcement actions against Defendants USDA, APHIS, and TAHC, after passage of at least 60 days, should the U.S. Environmental Protection Agency choose not to proceed with enforcement actions" proposed by Plaintiffs in their Notice of Intent.  *Id*.  In their "Sur-Reply in Opposition to Federal Defendants' Motion to Dismiss" (hereinafter, "Sur-Reply"),

Plaintiffs argue that they "have the right to enforce NEPA and ESA as part of the Verified Complaint[,]" because the "time limits associated with said Notice of Intent have expired without any action by appropriate authorities."  Dkt. No. 72 at 4.

To the extent that Plaintiffs' incorporation of their Notice of Intent into their Complaint is an attempt to assert additional claims in their Complaint, their attempt fails.  Plaintiffs' Notice of Intent references potential claims, but does not itself state any claim for relief against the Defendants in this lawsuit.  *See* Dkt. No. 1-1 at 2-5.  Further, Plaintiffs' Notice of Intent and Complaint fail to demonstrate that this Court would possess jurisdiction over these potential claims.  Plaintiffs have not moved to amend their live Complaint.  Accordingly, the Court will consider the factual allegations contained in the Notice of Intent, but will not construe Plaintiffs' references to violations of various other laws as live claims in this case.

**(5)  Summary.**  Perhaps in recognition of the fact that not all of their claims apply to the Federal Defendants, Plaintiffs' Response and Memorandum of Law in Opposition to Federal Defendants' Motion to Dismiss (hereinafter, "Plaintiffs' Response") summarizes their claims against the Federal Defendants as follows:

> Plaintiffs DAVIS and CASCABEL sue . . . "the Federal Defendants"[] for claims arising under the Constitution and laws of the United States, including specifically the 5th, 4th, and 14th Amendments of the U.S. Constitution; 5 U.S.C. § 552 *et seq*., 5 U.S.C. § 553(e); 5 U.S.C. § 553(b); 5 U.S.C. § 553(c); 5 U.S.C. § 554(c); 5 U.S.C. § 556(d); 5 U.S.C. § 552(a); 5 U.S.C. § 557, and 5 U.S.C. § 701 *et seq*., because of the Federal Defendants' failures to follow the dictates of the APA, while implementing Texas Tick Eradication Program, and for a declaration that the Federal Defendants' actions do not comply with the dictates of the APA.

Dkt. No. 55 at 10 (errors in original).

Having determined that Counts Four, Five, Ten and Eleven do not apply to the Federal Defendants, then, the Court is left to consider Counts One, Two, Three, Six, Seven, Eight and Nine.  Again, Plaintiffs identify these Counts as follow:

COUNT ONE:          Violation of the Administrative Procedures Act, 5 U.S.C § 553;

COUNT TWO:          Violation of the APA, 5 U.S.C. § 706;

COUNT THREE:       Other Violations of the APA;

COUNT SIX:           Violation of Constitutional Due Process Rights;

COUNT SEVEN:      Violation of Constitutional Rights: – Illegal Searches and Seizures;

COUNT EIGHT:       Violation of Constitutional Rights Insuring Equal Protection Under Law;

COUNT NINE:         Violation of National Environmental Policy Act for Failure to Prepare an Environmental Impact Statement (EIS).

Dkt. No. 1 at 69-77.

**B.   Subject Matter Jurisdiction and Standing.**   The Federal Defendants argue that this Court lacks subject matter jurisdiction because Plaintiffs lack standing to assert their claims.  *See* Dkt. No. 47 at 9-21, 26.  More specifically, Defendants argue that Plaintiffs have failed to show: (1) that they have or will suffer an injury in fact, which is concrete and particularized, and actual or imminent; (2) that there is a causal connection between their injury and Defendants' challenged conduct; and, (3) that their injury is "redressable by a favorable ruling."  *Id*. at 9 (citations omitted).

An examination of the parties' arguments reveals that the Article III standing issue of causation is intertwined with the merits of Plaintiffs' claims. That is, if Plaintiffs fail to state plausible facts indicating that they have been injured by Defendants' failure to comply with federal/constitutional law, they will have failed to state a claim, but they will also have failed to demonstrate standing. When jurisdictional issues are intertwined with the merits of a claim, it is generally proper to review the merits of a claim, rather than to dismiss the claim for want of jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682 (a "failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."). "The two exceptions are where the federal question 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous'." *Southpark Square Ltd. v. City of Jackson, Miss.*, 565 F.2d 338, 341 (quoting *Bell v. Hood*, 327 U.S. 678, 681-82); *Michael v. Boutwell*, 138 F. Supp. 3d 761, 775 (same). A claim may be considered clearly immaterial or wholly insubstantial and frivolous "only where the plaintiff's claim has no plausible foundation or is clearly foreclosed by a prior Supreme Court decision." *Williamson v. Tucker*, 645 F.2d 404, 416 (internal quotation marks omitted).

As discussed below, Plaintiffs' remaining claims against the Federal Defendants qualify as wholly insubstantial and frivolous because they have no plausible foundation. Like Counts Four, Five, Ten and Eleven, Plaintiffs' remaining

claims also appear constructed "solely for the purpose of obtaining jurisdiction," where federal jurisdiction does not lie.  *See Bell*, 327 U.S. 678, 683.

**(1)  Plaintiffs' Claims That the Federal Defendants Failed to Comply with the Administrative Procedures Act ("APA").**  In Counts One, Two, and Three, Plaintiffs claim that they have been injured by the Federal Defendants' failure to comply with the APA.  More specifically, Plaintiffs claim that they have been injured by the Federal Defendants' failure to comply with "5 U.S.C. § 552 *et seq.*, 5 U.S.C. § 553(e); 5 U.S.C. § 553(b); 5 U.S.C. § 553(c); 5 U.S.C. § 554(c); 5 U.S.C. § 556(d); 5 U.S.C. § 552(a); 5 U.S.C. § 557, and 5 U.S.C. § 701 *et seq.*"  Dkt. No. 55 at 10 (errors in original).  *See also* Dkt. No. 1 at 69-72.

Most of Plaintiffs' remaining causes of action are also premised upon Plaintiffs' APA claims.  That is, underlying most of Plaintiffs' remaining claims is the contention that their rights have been violated through the implementation of the Program because the Program fails to comply with the APA's requirements.

> Plaintiffs allege that they have been denied procedural and/or substantive due process requirements established by the Fifth Amendments to the U.S. Constitution, and have been subjected to illegal searches and seizures under the Fourth Amendment of the U.S. Constitution, and have been denied equal protection rights under the Fourteenth Amendment of the U.S. Constitution, *because* the USDA directives, memorandums, guidances, and regulation(s) espoused by USDA, APHIS, and TAHC*, while attempting to implement the federally funded joint Tick Eradication Program in Texas, are not law, and do not comply with the express provisions of the Administrative Procedure Act of 1946*, specifically 5 USC §552 *et seq.*, 5 USC §553(b-d); 5 USC §554(b-c); and 5 USC §701 *et seq.*

Dkt. No. 1 at 12 (errors in original, emphasis added).  *See also* Dkt. No. 55 at 10, ¶ 3 (stating that "Defendants' failures to follow the dictates of the APA" while

implementing the Program, have violated Plaintiffs' rights under "the 5th, 4th, and 14th Amendments of the U.S. Constitution; 5 U.S.C. §552 et seq., 5 U.S.C. §553(e); 5 U.S.C. §553(b); 5 U.S.C. §553(c); 5 U.S.C. §554(c); 5 U.S.C. §556(d); 5 U.S.C. §552(a); 5 U.S.C. §557, and 5 U.S.C. §701 *et seq*.,") (errors in original).

Plaintiffs support their APA claims, and those claims which are premised upon their APA claims, with three main factual allegations. First, Plaintiffs contend that the "USDA has not promulgated substantive rules pertaining to Co-Ral® 42%" Flowable Insecticide. Dkt. No. 72 at 6. Second, Plaintiffs claim the Federal Defendants have failed to abide by the "safety rules associated with Co-Ral® 42% Coumaphos Flowable Insecticide labels[.]" Dkt. No. 1 at 22. Third, Plaintiffs assert that the Federal Defendants have enforced "memorandums, guidances, and preferences as if they were regulations" and otherwise failed to act in accordance with the APA. *Id*. (errors in original). A review of these three main factual allegations reveals that Plaintiffs' claims have no plausible foundation; therefore, Plaintiffs have failed to demonstrate standing.

**(a) Plaintiffs' claims regarding the alleged non-approval of Co-Ral® 42% Coumaphos Flowable Insecticide.** Plaintiffs contend that the "USDA has not promulgated substantive rules pertaining to Co-Ral® 42%" Flowable Insecticide. Dkt. No. 72 at 6.

> Co-Ral® 42% Coumaphos Flowable Insecticide is <u>NOT approved</u> for use by the U.S. Department of Agriculture ("USDA"), nor the USDA' Animal and Plant Health and Inspection Service (APHIS"). Therefore, the <u>use of the Co-Ral® 42%</u> Coumaphos Flowable Insecticide is <u>NOT approved</u> by federal regulations. . . . Any use of Co-Ral® 42% Coumaphos Flowable Insecticide <u>is unapproved, in any form, whether</u>

> diluted or not, if applied by USDA/APHIS personnel. Any use of Co-Ral® 42% Coumaphos Flowable Insecticide also is in violation of the Administrative Procedure Act ("APA"), Pub. L. 79-404, 60 Stat. 237 (1946), 5 U.S.C. §§ 550 *et seq.* as described below. The Federal Defendants have ignored Plaintiffs' references to Co-Ral® 42% Coumaphos Flowable Insecticide because they know that it is not approved for their use in application to cattle. 9 C.F.R. §72.13 (confirming only 25% not 42% concentration).

Dkt. No. 55 at 11-12 (errors and emphasis in original, formatting altered).

Plaintiffs insist that "**only Co-Ral® 25% Coumaphos Flowable Insecticide is approved for use**." Dkt. No. 55 at 7 (emphasis in original). Plaintiffs cite 9 C.F.R. § 72.13(b) in support of this assertion. *Id.* In relevant part, § 72.13(b) provides as follows:

> (b) Permitted dips. The dips at present permitted by the U.S. Department of Agriculture in official dipping for interstate movement are:

> > (1) Approved proprietary brands of coumaphos (Co–Ral®), 25 percent wettable powder or flowable form labeled for use as a 0.25 percent dip and used at a concentration of 0.125 to 0.250.4

9 C.F.R. § 72.13(b)(1) (footnote omitted).

The Federal Defendants argue that Plaintiffs are misreading § 72.13(b). Dkt. No. 65. They contend that § 72.13(b) authorizes the use of the "'25 percent wettable powder'" form of Co-Ral®, or the "'flowable form labeled for use as a 0.25 percent dip'" which is used at "'a concentration of 0.125 to 0.250.'" *Id.* at 8 (quoting 9 C.F.R. § 72.13(b)(1)). In other words, the Federal Defendants argue that the 25% wettable powder form is "distinct" from the flowable form of Co-Ral®. *Id.* They indicate that there has never been a flowable form of Co-Ral® containing "25% of the active ingredient coumaphos." *Id.* Instead, the flowable form of Co-Ral® used by the

Program is the form of Co-Ral® which contains 42% of the active ingredient coumaphos. *Id.* at 7-8; *see also* Dkt. No. 47 at 16, note 10 ("Plaintiffs also refer repeatedly to "Co-Ral 42% Flowable Insecticide," . . . implying that the product is somehow inconsistent with the regulation authorizing its use in a .25% concentration. It is not. The "42%" on the label, reflects the percentage of active ingredient (coumaphos) in the concentrated form of the Co-Ral product.").

Contrary to Plaintiffs' claims, the Federal Defendants assert that the flowable form of Co-Ral® has been approved for purposes of dipping and spraying cattle since 1985. Dkt. No. 47 at 13. Citing "49 Fed. Reg. at 33,134" and "50 Fed. Reg. at 430[,]" the Federal Defendants state that the flowable form (that is, the form of Co-Ral® containing 42% coumaphos), was approved after "notice-and-comment rulemaking." *Id*.

The Federal Register confirms the Federal Defendants' argument. Specifically, the Federal Register confirms that the flowable form of Co-Ral® was approved for dipping and spraying of cattle in 1985, after notice-and-comment rulemaking. *See* 49 FR 33134-01, 1984 WL 115100(F.R.), and 50 FR 430-01, 1985 WL 82800(F.R.). In relevant part, the proposed rule, which was approved pursuant to notice-and-comment rulemaking,[6] provided as follows:

> The permitted dips listed in § 72.13 for the treatment of cattle for fever ticks include approved proprietary brands of coumaphos (Co-Ral), 25 percent wettable powder labelled for use as a 0.25 percent dip and used at a concentration of 0.125 to 0.250. . . . In addition to the 25 percent wettable powder, coumaphos is now available in a flowable form. Veterinary Services of APHIS has been requested to grant permitted dip status to this form of coumaphos. When prepared in accordance

---

[6] *See* 50 FR 430-01.

with the regulations, the solutions from both the wettable powder and the flowable form of coumaphos are identically the same chemical. Coumaphos is an organophosphorous compound which is registered by the Environmental Protection Agency under the provisions of the FIFRA for use against mites and ticks. Both the efficacy and stability of the flowable form of coumaphos have been demonstrated. In trials conducted by the Department, it has been shown that the concentration of the flowable form of coumaphos can be maintained. Field trials have also demonstrated that dipping cattle with the flowable form of coumaphos in the prescribed concentrations effectively eradicates ticks and scabies mites without injury to the animals. Therefore, it is proposed to add the flowable form of coumaphos to the lists of pesticides officially approved for the treatment of cattle prior to interstate movement to rid them of fever ticks and to rid them of scabies mites.

49 FR 33134-01.

Aside from Plaintiffs' above-summarized allegations, Plaintiffs have failed to allege any other facts to support of their claim that Co-Ral® 42% Coumaphos Flowable Insecticide has never been approved. Because Plaintiffs' allegations regarding the alleged non-approval Co-Ral® 42% Coumaphos Flowable Insecticide have no basis in fact, they have no plausible foundation and are wholly insubstantial and frivolous. Therefore, to the extent that Plaintiffs' claims are premised upon the alleged non-approval of Co-Ral® 42% Coumaphos Flowable Insecticide, Plaintiffs have failed to show that they have been injured by the Federal Defendants. Having failed to show an injury traceable to the Federal Defendants' challenged conduct here, Plaintiffs have failed to demonstrate standing. In the alternative, Plaintiffs have failed to state a claim because they have failed to allege plausible facts in support of their claims.

**(b)  Plaintiffs' claim that the Federal Defendants have injured them by failing to abide by the "safety rules associated with Co-Ral® 42% Coumaphos Flowable Insecticide labels[.]"**  Dkt. No. 1 at 22.  Plaintiffs state that the Federal Defendants have required total-immersion dipping, which involves inhalation and ingestion, and that inhalation and ingestion of Co-Ral® 42% Coumaphos Flowable Insecticide is "contrary" to its EPA-approved label.  *Id.* at 30. In support of these allegations, Plaintiffs reference an exhibit which they claim is the "Co-Ral® 42% Coumaphos Label[.]"  *See* Dkt. No. 1-8 at 1-14.

The label Plaintiffs reference does not support their claim that the Federal Defendants are using the insecticide contrary to its label.  The label does warn that the insecticide: (1) is fatal if swallowed by humans; (2) may be fatal if inhaled by humans; and, (3) should not be used to dip "excessively thirsty animals."  Dkt. No. 1-8 at 6, 10.  However, the label does not prohibit the dipping or full-immersion dipping of cattle.  *See id.* at 1-14.  Plaintiffs have not alleged any other plausible facts indicating that the Federal Defendants are using the insecticide contrary to its label.  To the extent that Plaintiffs' claims are premised upon this factual allegation, then, Plaintiffs' claims have no basis in fact.  Because Plaintiffs' claims have no basis in fact, they have no plausible foundation and are wholly insubstantial and frivolous.  Therefore, Plaintiffs lack standing because they have failed to show that they have been injured by the Defendants' challenged conduct. In the alternative, Plaintiffs have failed to state a claim because they have failed to allege plausible facts in support of their claims.

**(c)   Plaintiffs' claim that the Federal Defendants have enforced "memorandums, guidances, and preferences as if they were regulations" and otherwise failed to act in accordance with the APA.**  Dkt. No. 1 at 22 (errors in original).   Plaintiffs accuse the Federal Defendants of enforcing "non-existent" laws, failing to act in compliance with the APA, and otherwise taking actions unsanctioned by the APA.   *Id*. at 21.   In support of these assertions, Plaintiffs contend that the Federal Defendants have: (1) required Plaintiffs' cattle to be dipped by 100% immersion before sale, even though Plaintiffs' cattle tested negative for ticks; (2) prevented the sale of Plaintiffs' cattle when Plaintiffs' cattle tested negative for ticks; (3) prevented the sale of Plaintiffs' cattle because 100% of Plaintiffs cattle had not been tested; (4) quarantined Plaintiffs' properties without presenting evidence that the properties contained fever ticks; (5) denied Plaintiffs' right to have their cattle hand sprayed; and (6) threatened criminal charges if Plaintiffs did not comply with the Program requirements.

The Federal Defendants argue that Plaintiffs' claims here have no plausible foundation.   Dkt. No. 47 at 4-8, 11-13, 17-18, 20-25.   The Federal Defendants note that federal and state regulations and statutes authorize the Program and its provisions.

> The Program is firmly grounded in federal and state statutory authority provided by the Animal Health Protection Act, 7 U.S.C. §§ 8301-8317, and Texas Agriculture Code Annotated §§ 167.001-167.144 (West 2015). Detailed federal and state regulatory provisions are found at 9 C.F.R. §§ 72.01-72.25 and Title 4 of the Texas Administrative Code, Chapter 41.

*Id.* at 12-13.   The Federal Defendants contend that a review of these federal and state regulations and statutes reveals that Defendants' actions are authorized.   *Id.* at 5, 11-13.

The Federal Defendants are correct.   Federal and State statutes provide authority for the Program.   *See* 7 U.S.C. §§ 8301-8317, and Texas Agriculture Code Annotated §§ 167.001-167.144 (West 2015).   Detailed regulations for the Program are also provided in the Code of Federal Regulations and the Texas Administrative Code.   *See* 9 C.F.R. §§ 72.1-72.25, and 4 Texas Administrative Code, Chapter 41 (West 2016).   The regulations governing the Program authorize the actions Plaintiffs challenge and contradict Plaintiffs' assertions that the Federal Defendants have failed to comply with the APA or any other federal law.   *See id.*   In relevant part, the Code of Federal Regulations provides as follows:[7]

> 1.  "No animals infested with [fever] ticks or exposed to tick infestation may be moved interstate, except as provided in this part."  9 C.F.R. § 72.1.
>
> 2.  "[C]ontagious, infectious, and communicable disease" transmitted by fever ticks exist in portions of Texas.  Therefore, these portions "are hereby quarantined as provided in §§ 72.3 and 72.5, and the movement of cattle therefrom into any other State or Territory or the District of Columbia shall be made only in accordance with the provisions of this part and part 71 of this chapter."  9 C.F.R. § 72.1.
>
> 3.  "The area quarantined in Texas is the quarantined area described in the regulations of the Texas Animal Health Commission (TAHC) contained in §§ 41.14 through 41.22 of title 4, part II, of the Texas Administrative Code (4 TAC 41.14 through 41.22), effective June 23, 2002, which is incorporated by reference. This incorporation by

---

[7]  The regulations governing the Program are extensive, specific, and detailed.  Ordinarily, the Court would paraphrase these regulations, rather than quote them directly.  In this case, however, a review of the actual regulatory text sheds the clearest light upon Plaintiffs' claims that the Federal and State Defendants' actions are unauthorized by law.

reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51." 9 C.F.R. § 72.5.

4. "Cattle in quarantined areas where tick eradication is not being conducted may be shipped or transported interstate in accordance with §§ 72.9 through 72.15 under the following conditions: The cattle must have been dipped twice with a permitted dip as provided in § 72.13, with an interval of 7 to 12 days between dippings immediately preceding shipment, at a designated dipping station approved under § 72.16 and located in the State of origin of the shipment or, in specific cases, after having been otherwise treated at a designated dipping station under the supervision of an APHIS inspector and in a manner approved by the Administrator.   In all cases, the cattle must be inspected by an APHIS inspector just prior to final dipping, found to be apparently free of ticks, and be certified as such by APHIS before the cattle may be released for interstate movement."   9 C.F.R. § 72.6 (footnote omitted).

5. "Cattle in areas where tick eradication is being conducted in cooperation with State authorities, which on inspection by an APHIS inspector are found to be apparently free from ticks, may, after one dipping, with a permitted dip as provided in § 72.13, under the supervision of an APHIS inspector and certification by the inspector, be shipped or transported interstate for dip as provided in § 72.13, under the supervision of an APHIS inspector and certification by the inspector, be shipped or transported interstate for any purpose upon compliance with the requirements set forth in §§ 72.9 through 72.15." 9 C.F.R. § 72.7 (footnote omitted).

6. "Cattle located in areas where tick eradication is being conducted in co-operation with the State authorities, and which are on premises shown by the official records of tick eradication to be free from ticks, may, upon inspection and certification by an APHIS inspector, be shipped or transported interstate for any purpose without dipping upon compliance with the requirements set forth under §§ 72.9, 72.10, 72.12." 9 C.F.R. § 72.8.

7. "All interstate movements of inspected and certified and dipped and certified cattle shall be accompanied to final destination by a certificate of an APHIS inspector (which certificate shall show that the cattle so being moved have been dipped as required by § 72.6 or by § 72.7 and are free of ticks, or have been inspected as required by § 72.8 and are free of ticks)[.]."   9 C.F.R. § 72.9.

8.   "Cattle of the quarantined area shall be considered infested and shall not be placed in noninfectious pens or premises until after the final inspection or dipping."  9 C.F.R. § 72.11.

9.   "Dipping requirements; facilities; handling.  The dipping of cattle for interstate movement shall be done only with a permitted dip and at places where proper equipment is provided for dipping and for handling the cattle in a manner to prevent exposure to infection after the final dipping.  Cattle which are to be dipped shall be given an opportunity to drink sufficient water to quench their thirst prior to dipping, be carefully handled, and not dipped while they are in a heated or exhausted condition."  9 C.F.R. § 72.13(a).

10.   "Permitted dips. The dips at present permitted by the U.S. Department of Agriculture in official dipping for interstate movement are: (1) Approved proprietary brands of coumaphos (Co–Ral®), 25 percent wettable powder or flowable form labeled for use as a 0.25 percent dip and used at a concentration of 0.125 to 0.250."  9 C.F.R. § 72.13(b)(1).

11.   "Approval of dips.  Proprietary brands of dips are permitted to be used for purposes of this part only when approved by the Administrator, APHIS. Before a dip will be specifically approved as a permitted dip for the eradication of ticks, APHIS will require that the product be registered under the provisions of the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. 135 *et seq.*); that its efficacy and stability have been demonstrated; that trials have been conducted to determine that its concentration can be maintained and that under actual field conditions the dipping of cattle with a solution of definite strength will effectually eradicate ticks without injury to the animals dipped."  9 C.F.R. § 72.13(c).

12.   "When the cattle are to be dipped under APHIS supervision the owner of the cattle, offered for shipment, or his agent duly authorized thereto, shall first execute and deliver to an APHIS inspector an application for inspection and supervised dipping wherein he shall agree to waive all claims against the United States for any loss or damage to said cattle occasioned by or resulting from dipping or other treatment under this part, or resulting from any subsequent treatment prior to their interstate shipment, or resulting from the fact that they are later found to be still tick infested, and also for all subsequent loss or damage to any other cattle in the possession or control of such owner which may come into contact with the cattle so dipped or treated."  9 C.F.R. § 72.15.

13.  "Dipping is accomplished by thoroughly wetting the entire skin by either immersion in a chemical solution in a dip vat, or by spraying with a chemical solution using a spray-dip machine or a hand-held sprayer."  9 C.F.R. § 72.25.

The Texas Administrative Code also contradicts Plaintiffs' allegations.   In relevant part, it provides as follows:

1.  "Each area of the state will be classified by the commission as a free area, control purpose quarantine area, temporary preventative quarantine area, or tick eradication quarantine area.  The commission will immediately redesignate an area when any change in circumstances warrants reclassification.  Each area will be determined by the Animal Health Commission according to the needs of inspection and treatment for known or suspected infestation of ticks."   4 Tex. Admin. Code § 41.2 (a).

2.  "The commission will notify all livestock owners within an area, except the free area, as to the type area in which their livestock are located.  All changes in designation of an area will be in writing with the reason for change given."  4 Tex. Admin. Code § 41.2 (b).

3.  "The commission may establish quarantines on land, premises, and livestock for the purpose of regulating the handling of livestock and eradicating ticks or exposure to ticks in the free area or for the purpose of preventing the spread of tick infestation into the free area."  4 Tex. Admin. Code § 41.4.

4.  "Control purpose quarantine area-A premise or property designated by the commission, in writing, for a systematic inspection of livestock and premises and control of the movement of livestock in order to investigate and control a suspected exposure of animals to ticks outside the tick eradication quarantine area.  The boundaries of the area will be determined by evaluation of the barriers to the potential spread of ticks."  4 Tex. Admin. Code § 41.4 (1).

5.  "Temporary preventative quarantine area--An area designated by the commission for systematic inspection and treatment of livestock and premises, and control of movement of livestock, in order to detect and eradicate infestation and exposure from infested or exposed premises outside the tick eradication quarantine area.  The extent of

the area will be determined by evaluating the barriers to the potential spread of ticks." 4 Tex. Admin. Code § 41.4(2).

6.   "Tick eradication quarantine area--An area designated by the commission, through boundaries established by this chapter, for systematic inspection and treatment of livestock and premises, and control of movement of livestock, in order to detect and eradicate infestation from infested or exposed premises.  The extent of the area will be determined by evaluating the barriers to the potential spread of ticks.  This is the permanent quarantine area which is designated in §§ 41.14-41.22 of this Chapter (relating to Quarantine Line; Defining and Establishing Tick Eradication Areas), and in the United States Department of Agriculture Code of Federal Regulations Part 72.5, parallel to the Rio Grande River, commonly known as the buffer zone or systematic area."  4 Tex. Admin. Code § 41.4(3).

7.   "Movement is restricted from leaving a tick eradication quarantine area, temporary preventative quarantine area, or control purpose quarantined area. The owner or caretaker of livestock located in a tick eradication quarantine area, temporary preventative quarantine area, or control purpose quarantine area shall not move, or allow the movement of, any livestock from the area without the livestock having a commission approved permanent official identification device and a permit or certificate for movement issued by an authorized representative of the commission.  No person may accept a shipment of livestock from a tick eradication quarantine area, temporary preventative quarantine area, or control purpose quarantine area, unless the livestock are accompanied by an original permit or certificate for movement."  4 Tex. Admin. Code § 41.6(b).

8.   "Movement from an infested premise or exposed premise.  A certificate for movement will be issued after the livestock, if moving directly to slaughter by sealed conveyance, have had two consecutive dips not less than seven nor more than 14 days apart without scratch inspection unless required by § 41.8 of this title (relating to Dipping of Livestock); or have had two dips not less than seven days nor more than 14 days apart, with each dip following a scratch inspection that does not reveal ticks; or have been dipped through a swim vat following a scratch inspection and not less than 12 days nor more than 14 days after being dipped through a swim vat following a scratch inspection that does not reveal ticks."  4 Tex. Admin. Code § 41.6(b)(1).

9.   "Movement from an adjacent premise or check premise.  Certificates for movement will be issued after the livestock have been found free

from ticks by scratch inspection and then dipped; or have had three dips not less than seven nor more than 14 days apart without scratch inspection unless required under § 41.8 of this title or, if moving directly to slaughter by sealed conveyance, have had two dips not less than seven nor more than 14 days apart without scratch inspection unless required under § 41.8 of this title if moving directly to slaughter by sealed conveyance." 4 Tex. Admin. Code § 41.6(b)(2).

10. "General Requirements: (1) All scratch inspections, dipping, treatment, and vaccination prescribed in this section must be done under the supervision of a representative authorized by the commission." 4 Tex. Admin. Code § 41.8(a).

11. "Protest of designation of area or premise, dipping directions, or other orders.  Any person who desires a hearing for the purpose of protesting the designation of an area or premise, or any dipping direction, or scratching notice, or any other order of the commission issued under the provisions of these regulations, may file an appeal pursuant to Chapter 32 of this title (relating to Hearing and Appeal Procedures)." 4 Tex. Admin. Code § 41.11.

12. "Quarantined areas are as follows for Cameron County. Beginning at a point where the Hidalgo-Cameron County line intersects U.S. Highway 281, following U.S. Highway 281 in an easterly direction to where it intersects Boca Chica Boulevard, approximately 26.2 miles; thence, following Boca Chica Boulevard in an easterly direction to where it becomes Boca Chica Road and continuing in the same direction on Boca Chica Road to where it intersects a drain ditch, approximately 9.5 miles; thence, following this drain ditch in a northerly direction to where it intersects the Brownsville Ship Channel, approximately three miles; thence, following the Brownsville Ship Channel in a northeasterly direction to where it enters the Gulf of Mexico, a distance of approximately 17.5 miles." 4 Tex. Admin. Code § 41.22.

Finally, the Texas Agricultural Code contradicts Plaintiffs' allegations.   In relevant part, it provides:

1. "A person commits an offense if, as the owner, part owner, or caretaker of animals, the person fails to gather the animals for inspection at the time and place ordered by the commission under Section 167.008." Tex. Agric. Code Ann. § 167.131(a) (West 2015)

2.  "An offense under this section is a Class C misdemeanor unless it is shown on the trial of the offense that the defendant has been previously convicted under this section, in which event the offense is a Class B misdemeanor."   Tex. Agric. Code Ann. § 167.131(b) (West 2015).

To the extent that Plaintiffs' claims are premised upon the contention that the Federal Defendants' actions have not been authorized by the APA, Plaintiffs' claims have no basis in fact.   Because Plaintiffs' claims have no basis in fact, they have no plausible foundation and are wholly insubstantial and frivolous.   Therefore, Plaintiffs lack standing because they have failed to show that they have been injured by the Defendants' challenged conduct.   In the alternative, Plaintiffs have failed to state a claim because they have failed to allege plausible facts in support of their claims.   Under both analyses, Counts One, Two, and Three are subject to dismissal.

**(2)  Plaintiffs' Count Six Claim That the Federal Defendants Violated Their Fifth Amendment Due Process Rights.**   Plaintiffs repeatedly assert that the Federal Defendants have violated their due process rights by failing to comply with the APA.   Dkt. No. 1 at 33, 49, 50, 52, 53, 54, 55, 56, 65, 66-67, 69, 72, 75.   To the extent that Plaintiffs' claim here is premised upon alleged violations of the APA, they have failed to demonstrate standing for the reasons provided above.   In the alternative, Plaintiffs have failed to state a claim for relief for the reasons provided above.

To the extent that Plaintiffs' claim here is not premised upon alleged APA violations, Plaintiffs have failed to demonstrate standing.   In support of Count Six,

Plaintiffs merely incorporate "every allegation" in their Complaint by reference and state that they "have demonstrated that they have in fact been deprived of their due process rights under the Tick Eradication Program." Dkt. No. 1 at 75. This conclusory allegation does not suffice to meet Plaintiffs' burden. As Plaintiffs have not shown how any particular injury they have suffered is fairly traceable to a violation of their due process rights by the Federal Defendants, they have failed to demonstrate standing. In the alternative, Plaintiffs have failed to state plausible facts demonstrating that the Federal Defendants have violated their Fifth Amendment rights. Count Six is subject to dismissal.

**(3)   Plaintiffs' Count Seven Claim That the Federal Defendants Violated Their Fourth Amendment Rights By Conducting Illegal Searches and Seizures**. Plaintiffs repeatedly assert that the Federal Defendants have violated their Fourth Amendment rights by failing to comply with the APA. Dkt. No. 1 at 12, 42, 48, 49, 50, 52, 53, 54, 55, 56-57, 64, 65, 66, 67, 70, 71, 72. To the extent that Plaintiffs' claim here is premised upon alleged violations of the APA, they have failed to demonstrate standing for the reasons provided above. In the alternative, they have failed to state a claim for relief for the reasons provided above.

To the extent that Plaintiffs' claim here is not premised upon alleged APA violations, they have failed to demonstrate standing. In support of Count Seven, Plaintiffs state:

> Plaintiffs have demonstrated that they have in fact been subject to violations of the Fourth Amendment of the U.S. Constitution. This

> amendment establishes the sacred right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, which shall not be violated. The statement "Every man's house is his castle" is true with a person's cattle also. Every invasion of private property even if minute, is a trespass. What a person seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. The right of a cattle owner to defend his cattle against unlawful searches and seizures is sacred. Further, electronic surveillance, which is being threatened by Defendants TAHC and ELLIS, is also prohibited.

Dkt. No. 1 at 42 (errors in original).  Plaintiffs also incorporate "every allegation" in their Complaint by reference and state that they "have demonstrated that they have in fact been deprived of their rights against illegal searches and seizures under the Tick Eradication Program." *Id*. at 75-76.

Plaintiffs' allegations here do not suffice to meet their burden.  As Plaintiffs have not shown how any injury they have suffered is fairly traceable to a violation of their Fourth Amendment rights by the Federal Defendants, they have failed to demonstrate standing.  In the alternative, Plaintiffs have failed to state plausible facts demonstrating that the Federal Defendants have violated their Fourth Amendment rights.  Count Seven is subject to dismissal.

**(4)  Plaintiffs' Count Eight Claim That the Federal Defendants Violated Their Fourteenth Amendment Equal Protection Rights.**  Plaintiffs repeatedly assert that the Federal Defendants have violated their Fourteenth Amendment rights by failing to comply with the APA.  Dkt. No. 1 at 12, 42, 49, 50, 52, 53, 54, 55, 56, 57, 64, 65, 67.  To the extent that Plaintiffs' claim here is premised upon alleged violations of the APA, they have failed to demonstrate

standing for the reasons provided above.  In the alternative, they have failed to state a claim for relief for the reasons provided above.

To the extent that Plaintiffs' claim here is not premised upon alleged APA violations, they have failed to demonstrate standing.  Plaintiffs accuse the Federal Defendants of quarantining their properties while failing to quarantine similarly situated properties "due to the lack of properly enacted rules[.]"  Dkt. No. 1 at 23-24. Plaintiffs additionally accuse the Federal Defendants of discriminating against Plaintiffs by requiring compliance with procedures not required of other similarly situated ranchers, or more powerful ranchers.  *Id.* at 43.  Plaintiffs state that some ranchers have been allowed to sell tick-infested cattle, while Defendants have prevented Plaintiffs from selling cattle without ticks.  *Id.*  Similarly, Plaintiffs assert that Defendants have permitted some ranchers to omit dippings, while requiring Plaintiffs to subject their cows to dipping under "threat of criminal action[.]"  *Id.*  In support of Count Eight, Plaintiffs also incorporate "every allegation" in their Complaint by reference and state that they "have demonstrated that they have in fact been denied equal protection under color of law."  Dkt. No. 1 at 76.

Pursuant to the Equal Protection Clause of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  *See* U.S. Const. amend. XIV, § 1.  "[T]he Fourteenth Amendment applies only to state actors, not federal actors."  *Newsome v. E.E.O.C.*, 301 F.3d 227, 232 (5th Cir. 2002) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).  *See also San*

*Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543 n. 21 (1987) ("The Fourteenth Amendment applies to actions by a State.  The claimed association in this case is between the [defendant] and the Federal Government.  Consequently, the Fourteenth Amendment does not apply.").

Here, even if Plaintiffs could somehow demonstrate that the Federal Defendants were state actors, their claim would still fail.

> The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.  *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 174-175, 101 S.Ct. 453, 459-460, 66 L.Ed.2d 368 (1980); *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).  When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, *United States Railroad Retirement Board v. Fritz, supra*, 449 U.S., at 174, 101 S.Ct., at 459; *New Orleans v. Dukes, supra*, 427 U.S., at 303, 96 S.Ct., at 2516, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).  Plaintiffs state that they were treated unequally in comparison to other ranchers.  But, they have not alleged any plausible facts indicating that their alleged unequal treatment was unrelated to a legitimate state interest.  Plaintiffs have not shown how any injury they have suffered is fairly traceable to a violation of their Fourteenth Amendment rights by the Federal Defendants.  Therefore, Plaintiffs have failed to demonstrate standing.  In the alternative, Plaintiffs have failed to state plausible facts demonstrating that the Federal Defendants have violated their Fourteenth Amendment rights.  Count Eight is subject to dismissal.

**(5)    Plaintiffs' Count Nine Claim That the Federal Defendants Violated NEPA.**  Plaintiffs contend that the Federal Defendants violated NEPA by failing to prepare an environmental impact statement ("EIS") to assess the environmental effects of the Program.  Plaintiffs indicate that Defendants have also violated NEPA by chasing Plaintiffs' cattle on horseback and disrupting the eating routines and habitats of numerous protected species on Plaintiffs' land.  Further, Plaintiffs assert that Defendants have contaminated their land by illegally dumping insecticide on their properties after its use.  Plaintiffs state that this dumping has harmed the food supply, water supply, and habitats of various protected species including the Ocelot, the Aplomado Falcon, the Jaguarundi, the Texas Horned Lizard, the Texas Tortoise, and the Blue Indigo Snake.  Plaintiffs contend that Defendants have also been exterminating Nilgai antelopes on their property in an effort to prevent the spread of fever ticks, and that Defendants' extermination efforts have threatened Plaintiffs' safety.  Dkt. No. 1 at 24, 35-36, 39-41, 77.

NEPA provides "procedural mechanisms to ensure due attention be given to the impacts on the environment brought about as a result of major federal construction projects."  *Highland Vill. Parents Grp. v. U.S. Fed. Highway Admin.*, 562 F. Supp. 2d 857, 859 (E.D. Tex. 2008) (citing 42 U.S.C. § 4321 (2006)).  NEPA requires agency investigation into the consequences of "'major Federal actions' that significantly affect 'the quality of the human environment.'"  *Id.* (quoting 42 U.S.C. § 4332(c) (2006)).  NEPA is not subject to private enforcement.  *Id.* at 860.

> NEPA does not provide a private right of action.  Instead, challenges to NEPA-mandated decisionmaking are pursued through the APA.  *Gulf*

> *Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 367 (5th
> Cir. 2006); *Sw. Williamson County v. Slater*, 173 F.3d 1033, 1036 (6th
> Cir. 1999).  The APA allows a federal court to review a "final agency
> action."  5 U.S.C. § 704 (2006)[.]  Under the APA, the agency decision is
> set aside only if it is "arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006).

*Id.  See also City Park for Everyone Coal. v. Fed. Emergency Mgmt. Agency*, No.

CIV.A. 15-918, 2015 WL 6669666, at *3 (E.D. La. Nov. 2, 2015) ("NEPA . . . does not

provide a private right of action for violations of its provisions.  *Noe v. Metro.

Atlanta Rapid Transit Auth.*, 644 F.2d 434, 436-39 (5th Cir. 1981)").

By attempting to proceed through NEPA, Plaintiffs indicate that they have

been injured by a final agency action, or an agency's failure to take a discrete action.

*See Highland Vill. Parents Grp.*, 562 F. Supp. 2d 857, 860 (noting that a final

agency action may be set aside only if it is "'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006)").

However, Plaintiffs' claim that they have been injured by an agency failure to

prepare an EIS does not suffice to demonstrate standing.  Plaintiffs have failed to

identify an actual or imminent injury stemming from an agency failure to prepare

an EIS.  Plaintiffs have also failed to: (1) show that any Federal Defendant was

required to prepare an EIS; or (2) identify a final agency action refusing to prepare

an EIS.

Plaintiffs have also failed to state plausible facts indicating that their other

alleged injuries are the result of a final agency action, or failure to take a discrete

action.  Specifically, Plaintiffs have not shown that an agency failure to take action,

or a final agency action, has caused: (1) the dumping of insecticide on their

properties; (2) the chasing of Plaintiffs' cattle by persons on horseback; or (3) the shooting of Nilgai antelopes on Plaintiffs' property.   Although it is possible Plaintiffs' alleged injuries are actionable under some other legal theory, Plaintiffs lack standing to proceed with their NEPA claims.   In the alternative, Plaintiffs have failed to state a claim for relief.   Count Nine is subject to dismissal.

**(6)   Miscellaneous Allegations.**   Plaintiffs make additional allegations against the Federal Defendants that do not fit squarely within any of their claims. First, Plaintiffs accuse Federal Defendant APHIS of slandering Plaintiff Davis and damaging his reputation by calling him a troublemaker.   Dkt. No. 1 at 23.   Plaintiffs have not included a cause of action for slander in their Complaint.   *See id*. at 69-79. Further, Plaintiffs do not identify the individual within APHIS who called Davis a troublemaker, nor do they show that they have standing to hold APHIS liable under any theory of law for calling Davis a troublemaker.   To the extent that Plaintiffs intend their allegation here to state a claim within the jurisdiction of this Court, they have failed.

Second, Plaintiffs assert that Federal Defendant APHIS violated Davis's "constitutional" and First Amendment rights by "ordering lifelong friends who worked for Defendants not to speak with him."   Dkt. No. 1 at 23.   Here again, Plaintiffs do not identify the individual(s) within APHIS who allegedly gave this order, nor do they identify the alleged recipients of the order.   Plaintiffs have not included a cause of action for a violation of their First Amendment rights in their Complaint.   *See id*. at 69-79.   Moreover, even if someone with APHIS ordered some

employee of some Defendant to refrain from speaking to Davis, Plaintiffs have failed to show how this gives them standing to hold APHIS liable under any theory of law.  To the extent that Plaintiffs intend their allegation here to state a claim within the jurisdiction of this Court, they have failed.

Third, Plaintiffs accuse Federal Defendant APHIS of "refusing to provide documentation of results of inspection, thus elimination of documented proof of Defendants' improper activities related to cattle deaths, cattle injuries, and general damages, and preventing Plaintiffs from seeking appropriate reimbursement through the claim process[.]"  Dkt. No. 1 at 21 (errors in original).  Similarly, Plaintiffs contend that Federal Defendant APHIS: (1) frequently changed its "verbal commitments" and description of "so-called applicable laws;" (2) failed to give Plaintiffs "copies of asserted applicable laws;" (3) forced Plaintiffs to hire counsel and spend their time, money and energy to protect their legal rights; and, (4) denied Plaintiffs' "requests for open records[.]"  *Id.* at 21, 23.

To the extent that Plaintiffs intend these allegations to state a claim within the jurisdiction of this Court, Plaintiffs have failed.  Plaintiffs have not shown how these allegations support their stated claims against APHIS, nor have they shown how they support claims against APHIS under any other legal theory.  Plaintiffs have not provided the Court with any authority indicating that their protected rights have been violated.  Their allegations here amount to generalized grievances with the requirements and effects of the Program.  A plaintiff does not demonstrate standing by complaining of "generalized" grievances "shared in substantially equal

measure by all or a large class of citizens[.]"  *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citations omitted).  *See also LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) ("[A] plaintiff raising only a generally available grievance . . . does not state an Article III case or controversy and therefore lacks standing.") (internal citations omitted); *Hotze v. Burwell*, 784 F.3d 984, 992 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1165, 194 L. Ed. 2d 240 (2016) (same).

## V.  Recommendation

For the foregoing reasons, Plaintiffs lack standing to assert their claims. Therefore, this Court lacks subject matter jurisdiction over Plaintiffs' Complaint.  It is recommended that the Court dismiss Plaintiffs' Complaint without prejudice pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  As the Federal Defendants' Motion (Dkt. No. 47) seeks this same relief, it is recommended that the Court grant the Federal Defendants' Motion.[8]  In the alternative, and for the reasons provided above, it is recommended that the Court dismiss Plaintiffs' Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## VI.  Notice to the Parties

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and

---

[8]  The Federal Defendants' Motion provides additional grounds for dismissal under Rule 12(b)(1) and 12(b)(6), not addressed in this Report.  *See generally* Dkt. No. 47.  The Court has reviewed all of the relevant submissions in this case and finds that the Federal Defendants' additional grounds for dismissal are also largely correct.

recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

Signed on this 8th day of September, 2016.

_____
Ignacio Torteya, III
United States Magistrate Judge